(3 App. Div. 70.)

## HOPE v. FALL BROOK COAL CO.

(Supreme Court, Appellate Division, Fourth Department. March, 1896.)

1. MASTER AND SERVANT—DEFECTIVE APPLIANCES—EVIDENCE.

In an action for injuries received by plaintiff, a brakeman, while coupling cars to a yard engine, plaintiff testified that he was standing on the footboard of the engine, and, as he reached over to set the coupling pin, he was blinded by steam which came out of the relief valve and the cylinder, and that his hand was caught between the bumpers. There was some evidence that the steam leaked from the engine, but to what extent, or from what cause, did not appear. Plaintiff testified

that, though he had worked with the engine about four hours the day of the accident, he did not know that it leaked steam. Evidence was given on behalf of defendant that it did not leak steam any more than engines in perfect condition. *Held*, that a verdict for plaintiff was based on conjecture, inasmuch that it left to the jury to measure the quantity of steam issuing from the valve, and that escaping from the cylinder.

2. NEGLIGENCE—NATURAL CONSEQUENCES.

The crushing of a brakeman's hand while coupling cars is not the natural or probable consequence of a defect in the engine, by which the brakeman was suddenly enveloped in a dense cloud of steam.

Appeal from circuit court, Steuben county.

Action by William H. Hope against the Fall Brook Coal Company. From a judgment entered on a verdict in favor of plaintiff for $5,788.10 damages and costs, and from an order denying a motion for a new trial made on a case and exceptions, defendant appeals. Reversed.

This action was to recover damages for injuries received by the plaintiff through the alleged negligence of defendant. The plaintiff entered the employ of defendant in May, 1887. He worked upon the road six or eight months as brakeman, and then in the yards of defendant at Corning, as night switchman, and continued as such until the accident. On the 5th day of December, 1889, the plaintiff went to the yards of defendant at 6 o'clock in the evening, and worked until 10, switching cars. That was the first time plaintiff had worked on the engine which was used that night for switching. This switch engine was known as "No. 13." It had a footboard on each end. It had no pilot. It had one buffer extending in front about 18 inches, and a mouthorgan drawhead, or "niggerhead." The plaintiff gives the following account of the situation just previous to the accident, and the manner in which the accident happened, and its cause: "We had got through making up a train, and had cleared out for another. We all got on the engine at that time. That was the first time I was on the front of the engine that evening. I had a common railroad lantern, which I set on the bumper, just back of where my hand was." "I do not know whether or not it was moonlight. I think it was apparently dark. I do not know whether there was any moon that evening. We were going to couple to a gondola car. I put the link in the drawhead of the engine just before we came to that car. I didn't look to see if there was a link in the drawhead of the gondola. The engine had a headlight that showed me the end of the gondola with perfect distinctness. We were about three car lengths from the car when the headlight showed the end of the gondola. The engine was going something like four or five miles an hour. I put the link, with my left hand, into the niggerhead, and dropped the pin into the end of the link with my right hand. At that time I had approached, I think, two, four, or five feet from the end of the car. My lantern was standing on the bumper of the engine. When I had put the link into the niggerhead of the engine, I think, I made the coupling,— undertook to make it." "I stood on the footboard, and put the link in the car, and reached over and entered the link, and I reached to set the pin; and the steam came out of the valves, and blinded me so I could not see when I went to set the pin, and my hand was caught in the operation." "I was reaching with my left hand to put the pin into the drawhead of the car when my arm was caught between the bumper on the gondola and the bumper on the engine." "Q. Describe how the steam came out that night. A. As I stood upon the footboard of the engine, the steam came from the relief valve of the cylinder, or upon the steam chest, rather, and also out of the piston." "Q. As this engine approached the car, was the steam escaping all the time? A. I think not. Q. As you approached the car, did or did not the engineer, or whoever was running the engine, slow the engine down? A. Yes, sir. Q. State when it was when this steam escaped, with reference to that? A. I think it escaped when he reversed his engine. Q. To slow an engine down, you reverse it? A. Yes, sir; or shut the cock." No other person witnessed this accident, and this is all the evidence given concerning the acci-

dent. Other evidence was given by plaintiff's witnesses tending to show that, at the time of the accident, steam did escape from some of the valves, and from around the piston of the engine. There is some evidence in plaintiff's behalf tending to show that steam had so escaped on different occasions preceding the time of the accident, but to what extent, or from what cause, does not clearly appear. The plaintiff himself testifies that, although he worked with this engine from 6 o'clock in the evening until 10 o'clock, when the injury occurred, he did not notice that the engine leaked steam. There was also evidence given by the plaintiff's witnesses showing that if plaintiff had stood upon the right side of the engine, instead of the left, he could have made the coupling with perfect safety, as upon the right there was no buffer, but, as he stood, there was a buffer between him and the drawheads. The plaintiff testified that when he went to work in the yards he was instructed by the yard master to work upon the left side of the engine, and that he was there in pursuance of such instructions.

At the close of plaintiff's case a motion was made by defendant's counsel for a nonsuit upon the grounds "(1) that there was no negligence on the part of the defendant proven; (2) that it was not proven on the part of the plaintiff that he was free from contributory negligence; (3) that there was no proof that the engine was not as other engines are, or that it leaked steam any more than ordinary engines do; (4) that, even if the engine were out of condition, there was no notice proven to the defendant of its condition." That motion was denied, and defendant duly excepted. Evidence was then given by defendant tending to show that the engine was in perfect condition; that it did not leak steam to any appreciable extent, or more than engines in perfect condition; that the plaintiff, if he had been reasonably prudent in selecting the position where he was to do his work, would have stood upon the right of the engine, instead of upon the left; that, if he had occupied the position upon the right, he could have made the coupling with perfect safety. The yard master denied that he had ever directed plaintiff to work upon the left of the engine. Evidence was also given by defendant showing that a person standing at the right of the engine could signal by voice or lantern to the engineer, whose position in the engine was upon that side, and that if the switchman stood upon the left of the engine he could not see the engineer. The cause was submitted to the jury, and they rendered a verdict in favor of the plaintiff for $5,000, which, together with the interest from the time of the verdict to the time of the entry of judgment, and the costs, constitute the amount of the judgment entered against defendant. After entry of judgment a case and exceptions were made and settled, and a motion thereon made for a new trial before the justice who presided at the trial. Such motion was denied. The case comes into this court upon the appeal from the judgment and from the order denying the motion for a new trial.

Argued before HARDIN, P. J., and FOLLETT, WARD, and GREEN, JJ.

Daniel Beach and Gabriel L. Smith, for appellant.

James Bacon, for respondent.

GREEN, J. The question, when an injury is done, is whether there is any responsible person, who could, if he had chosen, have prevented it, but who, either seeing the evil consequences, or negligently refusing to see them, has put into motion, either negligently or intentionally, a series of material forces by which the injury was produced. This is the basis of the distinction between causes and conditions. Whart. Neg. § 85. The cause of the injury was the action of the buffers in coming together. The escape of the steam was a condition of the injury. It is not merely distance of place or causation that renders a cause remote. The cause nearest in order of causation, which is adequate, without any efficient concurring cause, to produce the result, may be considered the direct cause.

It is incumbent upon the plaintiff to prove—First, the defect in the engine; second, negligence of defendant in respect to such defect; and, third, that the injury sustained was the direct, immediate consequence of such negligence. The escape or discharge of steam from a locomotive is one of the usual and ordinary incidents of the business that the plaintiff undertook to perform. Whether, in the particular instance, a switchman would be liable to be enveloped in escaping steam while engaged in making a coupling, would depend upon the force and direction of the wind, and his position, at the time. . Steam is almost instantly dispelled, and quickly changes its density and position. Upon the evidence given in this case, the jury were left to draw the inference that if no steam had escaped from the defective valve the plaintiff would not have sustained any injury, notwithstanding some portion of the steam was discharged by the relief valve, in respect to which no negligence could be predicated. In other words, the court left it to them to weigh or measure the quantity of steam issuing from the defective valve and that escaping from the relief valve, to determine its density, and then infer or conjecture that the former was of sufficient density, without the existence of the latter, to cause or produce the injury, and that the injury would have occurred even if no steam had escaped from the relief valve. When we consider the dangerous character of plaintiff's employment, and the many accidents that occur in its pursuit, it seems an unwarrantable conclusion that the discharge of steam from a locomotive is the proximate, or one of the immediate, causes of the injury.

Then, again, it is difficult to conceive that the injury was the natural or probable consequence of the defective valve, and that it ought to have been foreseen or reasonably expected or anticipated, in the light of the attending circumstances, by a person of ordinary intelligence and prudence. A person is not called upon to use that degree of care against an improbable result which he would be bound to use against a probable one. A man is not bound to ward against a result which cannot be reasonably expected to occur, and negligence cannot be attributed to him for failing to do so. Negligence is ordinarily a question for the jury, but only when the facts would authorize a jury to infer it. Sutton v. Railroad Co., 66 N. Y. 249. So, as to inferring a consequence or result from the state of the atmosphere, the presence of steam, and the force and direction of the wind, whereby a man lost his hand by placing it between the buffers. That is not the usual, ordinary, or natural consequence of steam. An essential element of negligence is a knowledge of facts which render foresight possible, and the circumstances necessary to be known before the liability for the consequence of an act or omission will be imposed must be such as would lead a prudent man to apprehend danger. All are bound to foresee what experience will teach them is likely to follow from the existence of a given state of facts. In a given case, action must be dictated by experience. Where there is no knowledge of facts which would lead to an apprehension of danger, there can be no imputation of foresight or blameworthiness, and these two ingredients are necessary to constitute

negligence. McNish v. Village of Peekskill, 91 Hun, 327, 36 N. Y. Supp. 1022. How could it be reasonably held that a man of ordinary or common intelligence or prudence could reasonably expect, foresee, or anticipate that the escape of steam from a defective valve in a locomotive would or could result in the amputation of the hand of a switchman, as a direct or proximate cause? The discharge of steam is a usual or necessary concomitant of the use of the engine, and a switchman must be expected to be enveloped in more, or less steam, irrespective of any defect in the valves. It seems to me that the right of plaintiff to recover must be based upon neglect to furnish a safe place, or rather upon negligence in rendering the place dangerous at the instant of time plaintiff was engaged in performing the act. The plaintiff's contention is that the place was rendered dangerous "upon the instant," whereby a vapor or mist was created which resulted in the injury to plaintiff. Then the plaintiff tells the jury, in effect, that this vapor from the defective valve was of such density, irrespective of the vapor from the relief valve, as to greatly impair his vision; and the jury takes his word for it, and then draws the conclusion that the vapor was the immediate or proximate cause of the plaintiff's getting his hand between the buffers. This vapor was not the cause of the accident, but was a condition under which it occurred; and that condition was wholly unexpected, and not likely to be foreseen. The immediate cause of the injury was the action of the buffers coming together while the plaintiff was in the act of making the coupling. What was the causa causans? The jury says it was the density of the vapor. Plaintiff was engaged in doing a very dangerous act. He claims that he was not negligent; that no negligence, carelessness, or recklessness on his part contributed to the injury; that he had no time to abstain from placing the coupling pin while the vapor was collecting, enveloping him and obstructing his vision. And the jury believed that must be so, because the plaintiff told them so. Were the jury at liberty to conjecture that the plaintiff did not continue to perform or execute the act while his vision was impaired? That he could not wait until the vapor was dispelled in a few seconds? That he must continue his work in a place known to him to be at all times dangerous, and rendered doubly so by this vapor? A thorough and critical examination of all the evidence in this case convinces me that the conclusion of the jury, voiced by its verdict, must necessarily have been the result of misconception, conjecture, or surmise. Certainly the verdict is unsupported by the evidence, and the court must have no hesitancy or delicacy in so declaring, however exalted an opinion the court may have for the jury system, and for the judgment, intelligence, impartiality, and integrity of American jurors.

I am of the opinion that the judgment and order should be reversed, and the motion for new trial granted, with costs to abide the event of the action. All concur.