790 F.2d 688
 1987 A.M.C. 324
 Paul ASLAKSON, individually and on behalf of his wife, Mavis
Aslakson, and as Personal Representative of the
Estate of Timothy Aslakson, deceased, Appellants,
v.
UNITED STATES of America, Appellee.
 No. 85-5132.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 13, 1985.
Decided May 9, 1986.
 
 John D. Kelly, Fargo, N.D., for appellants.
 Irving Pianin, Washington, D.C., for appellee.
 Before LAY, Chief Judge, FAGG, Circuit Judge, and ROSENBAUM,* District Judge.
 FAGG, Circuit Judge.
 
 
 1
 Paul Aslakson appeals from the district court's dismissal of his claim seeking damages against the United States for the death of his son, Timothy Aslakson. Timothy was killed in a boating accident on Devils Lake, North Dakota, when the aluminum mast of his sailboat made contact with electrical power lines owned and operated by the Western Area Power Administration (WAPA), an agency of the United States government. Aslakson claims that the United States was negligent by failing to provide adequate vertical clearance between the power lines and the surface of the water. The United States denies any liability for the accident on the basis that its decision not to elevate the lines beyond the clearance provided is immune from a tort suit under the "discretionary function" exception to the Federal Tort Claims Act (FTCA). 28 U.S.C. Sec. 2680(a).
 
 
 2
 The district court agreed with the United States, holding that WAPA employees' determination that the clearance provided under the power lines in question did not constitute a safety hazard was a discretionary decision and came within the scope of the exception. Hence, the district court dismissed Aslakson's complaint for lack of subject matter jurisdiction. We reverse.
 
 
 3
 WAPA transmits electrical power to fifteen central and western states. As part of its responsibility in the transmission of this electrical power, WAPA constructs and maintains its electrical power lines in accordance with the National Electric Safety Code (NESC). Rule 013B of the NESC states: "Existing installations, including maintenance replacements, which comply with prior editions of the Code, need not be modified to comply with these rules, except as may be required for safety reasons by the administrative authority." WAPA is its own administrative authority.
 
 
 4
 WAPA inspects and maintains these lines on a routine basis. WAPA has a local maintenance crew at Devils Lake that carries out monthly aerial inspections of the transmission lines. Furthermore, ground inspections are conducted annually. As part of its responsibility, the maintenance crew is instructed to look for clearance problems caused by changed conditions and report any such clearance problems to the main office.
 
 
 5
 The particular power lines involved in this case were constructed in 1950 to comply with the 1948 edition of the NESC. As originally constructed, the power lines provided a vertical clearance of 28 feet and passed over land rather than water. Later the water level of Devils Lake rose to such an extent that the lines crossed over an area of Devils Lake called Creel Bay.
 
 
 6
 Motivated by a concern over what effect the rising water level of Devils Lake might have on WAPA's power lines, several WAPA employees conducted a field review of the lake in 1979. The review team did not inspect the lines over Creel Bay but focused its attention on the lines that crossed the main part of Devils Lake. After its inspection the review team concluded that the height of the conductors over the water surface "could be a hazard to tall-masted sailboats on the lake."
 
 
 7
 Although several long term solutions were suggested by the review team such as rerouting the lines and installing submarine cable, WAPA decided to elevate the existing lines over the main part of Devils Lake. Hence, in the spring of 1980 the power lines were retensioned to comply with the current edition of the NESC. The retensioned lines provided a vertical clearance of over fifty feet.
 
 
 8
 WAPA took no action, however, either to increase the vertical clearance or to warn boaters of the power lines over Creel Bay. According to Vernon Hartwick, WAPA's district manager of the Bismarck office, the power lines over Creel Bay were not considered a hazard, because of their remote location and because no reports or complaints had been received regarding their low vertical clearance.
 
 
 9
 The accident occurred on June 20, 1982, while Timothy was sailing a Hobie Cat sailboat on the north end of Creel Bay. Timothy was severely shocked when the sailboat's 26.5 foot mast made contact with WAPA's power lines. Timothy's body was later recovered in water that was approximately six feet deep.
 
 
 10
 The district court held that WAPA's policy was to maintain its power lines in conformity with the minimum vertical clearance requirements of the NESC in effect at the time the lines were installed. Based upon depositions filed with the court, the district court found that the power lines over Creel Bay provided a minimum vertical clearance of 27 feet at the time of the accident and that this clearance was in compliance with the 1948 edition of the NESC.
 
 
 11
 The district court also observed that WAPA's policy required it to raise the lines to comply with later revisions of the NESC only if the power lines constituted a safety hazard. WAPA's policy was "to leave the determination as to what constitutes a safety hazard to the District Managers, based upon their assessment of each individual case. * * * The team of WAPA personnel sent to review the power lines over Devils Lake determined the transmission lines over Creel Bay were not a safety hazard. This was a discretionary function of the type exempted from the FTCA by 28 U.S.C. Sec. 2680(a)."
 
 
 12
 The Federal Tort Claims Act allows individuals to sue the United States for damages for personal injury or death resulting from the negligence or wrongful acts of its employees while acting within the scope of their employment. 28 U.S.C. Sec. 1346(b). In such an instance, the United States is liable to the claimant to the same extent as a private individual would be under the same circumstances. Id.
 
 
 13
 The United States, however, did not waive its sovereign immunity in all respects. One significant exception provides that the United States cannot be held liable for the negligence of its employees who are performing a discretionary function or duty. 28 U.S.C. Sec. 2680(a).
 
 
 14
 The Supreme Court characterizes the discretionary function exception as "the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 104 S.Ct. 2755, 2762, 81 L.Ed.2d 660 (1984). Hence, our inquiry centers on whether WAPA's determination that the power lines over Creel Bay did not constitute a safety hazard and its subsequent decision not to elevate those lines is the type of decision that Congress intended to shield from tort liability. In order to make this determination, we must consider the nature and scope of the discretionary function exception.
 
 
 15
 The Supreme Court in Varig Airlines held that the United States was not liable for the negligence of the Federal Aviation Administration (FAA) in certificating certain aircraft for use in commercial aviation. The FAA had developed a system of spot-checking aircraft manufacturers to police compliance with minimum safety standards. However, the ultimate responsibility of assuring compliance was left with the manufacturer.
 
 
 16
 In defining the scope of the discretionary function exception, the Court focused upon two factors to consider in its analysis.
 
 
 17
 First, it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case. * * * Thus, the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee--whatever his or her rank--are of the nature and quality that Congress intended to shield from tort liability.
 
 
 18
 Varig Airlines, 104 S.Ct. at 2765.
 
 
 19
 The second prong of the analysis provides some guidance regarding the underlying basis for the discretionary function exception. From a review of the legislative history of section 2680(a) and earlier tort claim bills, the Court observed that whatever else the exception may include, Congress clearly intended for the exception to apply when the government was engaged in regulatory activity. In doing so, "Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Varig Airlines, 104 S.Ct. at 2765.
 
 
 20
 The contours of the discretionary function cannot be defined with precision. Id. Thus, each case must be analyzed individually based upon relevant criteria in determining whether the acts of government employees are protected from liability under section 2680(a).
 
 
 21
 This court had the opportunity to apply the ruling of Varig Airlines in McMichael v. United States, 751 F.2d 303 (8th Cir.1985). McMichael concerned the second appeal of consolidated actions against the United States seeking damages for deaths and injuries caused by an explosion at a munitions plant.
 
 
 22
 In our earlier decision, we held that the Defense Department's failure to enforce a contractor's compliance with safety regulations was not the kind of decision protected by the discretionary function exception. Madison v. United States, 679 F.2d 736 (8th Cir.1982). We remanded the case to the district court to determine whether the plaintiffs could establish their negligence claim under Arkansas law. On remand, after the district court denied the government's motion to dismiss the complaints, the government filed an interlocutory appeal. We directed the parties to file supplemental briefs concerning the effect of Varig Airlines.
 
 
 23
 After considering the import of Varig Airlines, we held that our prior opinion was "entirely consistent" with the Supreme Court's analysis. In so doing, we observed two important distinctions between Varig and McMichael. First, the FAA in Varig was acting solely in its regulatory capacity. The Defense Department in McMichael was pursuing a proprietary rather than a regulatory objective in its contract to manufacture photo-flash cartridges. Id. at 306.
 
 
 24
 Second, FAA officials in Varig were given broad discretion in determining the number and frequency of their spot checks, and primary responsibility for safety compliance was placed on the manufacturer. In contrast, the Defense Department in McMichaels retained the responsibility for assuring safety at the munitions plant.
 
 
 25
 The Defense Department kept three quality assurance inspectors on site at the plant. These inspectors had the responsibility to assure safety at the plant, including compliance with the requirements of a government safety manual. Thus, we concluded that "the Defense Department inspectors were not called upon to make discretionary regulatory judgments. Rather, they had a number of precise inspections to perform which involved no judgment concerning agency policy." McMichael, 751 F.2d at 307. Hence, the discretionary function exception does not apply to a claim that government employees failed to comply with regulations or policies designed to guide their actions in a particular situation. Accord National Carriers, Inc. v. United States, 755 F.2d 675, 677-78 (8th Cir.1985); Bergmann v. United States, 689 F.2d 789, 792 (8th Cir.1982).
 
 
 26
 In this case, the United States invokes the exception on the basis that its policy required only that its power lines meet the standards of the 1948 edition of the NESC. Because the district court found that WAPA's power lines met the minimum vertical clearance requirements of the 1948 standards, the United States asserts that WAPA's power lines were within the requirements of its own policy. We disagree.
 
 
 27
 Initially, we question whether WAPA's power lines were indeed in compliance with the 1948 standards. The district court based its finding that the power lines met these standards on depositions of government officials who stated that the lines over Creel Bay provided a minimum vertical clearance of 27 feet. Admittedly, these measurements were taken not from the water's surface but from the bottom of a boat. As the government states in its brief, the extent to which the bottom of the boat is below the water's surface can only be speculated. Furthermore, the measurements were taken at a point where the government employees estimated the accident took place and not at the lowest point of the power lines over Creel Bay.
 
 
 28
 Aslakson challenges all of these findings on appeal. Furthermore, Aslakson claims that the United States miscalculated the formula used to determine the minimum vertical clearance requirements under the 1948 edition of the NESC. We believe that Aslakson should have been given the opportunity to demonstrate that the government failed to meet the 1948 standards. Therefore, we conclude the district court improperly dismissed the case for lack of jurisdiction. Even assuming, however, that the district court was correct in finding that WAPA's power lines were in compliance with the 1948 standards, we would still reach the same conclusion.
 
 
 29
 Under its policy, although WAPA is bound to the minimum vertical clearance requirements of the NESC in effect at the time of construction of its power lines, it must elevate those power lines to comply with revisions of the Code if safety reasons require such action. The United States claims that any decision by WAPA officials regarding the safety of its power lines is within the scope of the discretionary function exception. We cannot agree.
 
 
 30
 We believe that such an expansive interpretation would result in the exception swallowing the rule. This view would immunize from judicial review all government activity except the most ministerial acts. See Griffin v. United States, 500 F.2d 1059, 1063-64 (3d Cir.1974).
 
 
 31
 As a general rule, operational mismanagement in the maintenance of electrical transmission lines does not fall within the scope of the discretionary function exception. See McGarry v. United States, 549 F.2d 587, 590-91 (9th Cir.1976), cert. denied, 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977); United States v. Washington, 351 F.2d 913, 915-16 (9th Cir.1965); Hardy v. United States, 187 F.Supp. 756, 762 (E.D.S.C.1960).
 
 
 32
 WAPA's policy clearly required it to elevate its power lines if safety considerations compelled such action. Where the challenged governmental activity involves safety considerations under an established policy rather than the balancing of competing public policy considerations, the rationale for the exception falls away and the United States will be held responsible for the negligence of its employees. See McMichaels, 751 F.2d at 306-07. See also Henderson v. United States, 784 F.2d 942, 943 n. 2 (9th Cir.1986) (missile facility's safety decisions do not come within the scope of the discretionary function exception); Alabama Electric Cooperative, Inc. v. United States, 769 F.2d 1523, 1536-37 (11th Cir.1985) (United States will be held liable for damages resulting from the Corps of Engineers' negligent design of a flood control project in the absence of social, economic, or political policy considerations in making its design decisions.); Begay v. United States, 768 F.2d 1059, 1064 (9th Cir.1985) ("[T]he exception applies when the agency makes a decision that is grounded in social, economic, and political policy.").
 
 
 33
 "For the government to show merely that some choice was involved in the decision-making process is insufficient to activate the discretionary function exception. The balancing of policy considerations is a necessary prerequisite." Drake Towing Company, Inc. v. Meisner Marine Construction Co., 765 F.2d 1060, 1064 (11th Cir.1985) (citations omitted). WAPA's determination that the power lines over Creel Bay were not a safety hazard did not involve an evaluation of the relevant policy factors; rather it was a decision made by WAPA officials charged with the responsibility of implementing an already established policy.
 
 
 34
 Furthermore, WAPA's policy does not allow its officials to choose a course of action they deem desirable if their power lines are dangerously low. The policy's mandate is clear; WAPA must raise its power lines if they constitute a safety hazard. Cf. Madison, 679 F.2d at 741 ("[O]nce [the government] has exercised its discretion to adopt [safety] rules and to conduct safety inspections, it is obligated * * * to take reasonable steps to enforce compliance with the applicable safety regulations.").
 
 
 35
 Although such a policy necessarily involves some degree of judgment on the part of government officials, it is not the kind of judgment that involves the weighing of public policy considerations. On the contrary, it is the kind of judgment that requires the knowledge and professional expertise of government employees who implement government policies. Cf. Griffin, 500 F.2d at 1066 ("Where the conduct of Government employees in implementing agency regulations requires only performance of scientific evaluation and not the formulation of policy, we do not believe that the conduct is immunized from judicial review as a 'discretionary function.' ") (cited with approval in Alabama Electric Cooperative, 769 F.2d at 1529-30).
 
 
 36
 Aslakson's challenge to the governmental activity involved here goes not to the policy itself or to the manner in which WAPA chose to implement that policy. Furthermore, the challenged conduct is neither regulatory in nature nor administrative decision-making grounded in social, economic, or political policy. Rather, Aslakson claims WAPA officials were guilty of failing to comply with their own safety policy in the maintenance of their electrical transmission lines. This claim smacks of "ordinary 'garden-variety' negligence," Chotin Transportation, Inc. v. United States, 784 F.2d 206, 211 (6th Cir.1986), and the meeting by WAPA officials of their responsibility under the safety policy does not come within the scope of the discretionary function exception. See Angel v. United States, 775 F.2d 132, 145 (6th Cir.1985); McGarry, 549 F.2d at 591.
 
 
 37
 "By fashioning an exception for discretionary governmental functions, * * * Congress took 'steps to protect the Government from liability that would seriously handicap efficient government operations.' " Varig Airlines, 104 S.Ct. at 2765 (quoting United States v. Muniz, 374 U.S. 150, 163, 83 S.Ct. 1850, 1858, 10 L.Ed.2d 805 (1963) ). We conclude that holding WAPA responsible for compliance with its own safety policy regarding its electrical transmission lines will not undermine its governmental function. Hence, the conduct of WAPA officials must be reviewed in accordance with North Dakota's tort law standards. 28 U.S.C. Sec. 1346(b).
 
 
 38
 Accordingly, we reverse the district court's dismissal of Aslakson's complaint for lack of subject matter jurisdiction and remand for further proceedings.
 
 
 
 *
 The HONORABLE JAMES M. ROSENBAUM, United States District Judge for the District of Minnesota, sitting by designation