**C.R.S., a minor, by D.B.S. in his dual capacity as her father and natural guardian and as her guardian ad litem; D.B.S. and N.A.S., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 4–90–299.

United States District Court,
D. Minnesota,
Fourth Division.

May 5, 1993.

---

MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

## FACTS

This is an action brought under the Federal Tort Claims Act (FTCA), in which plaintiffs allege that they contracted the human immunodeficiency virus (HIV) because of defendant's negligence. In 1983, while undergoing basic training in Georgia, plaintiff D.B.S. experienced severe rectal bleeding. On August 9, 1983, he was admitted to Martin Army Community Hospital (MACH), where he underwent surgery; in the course of his treatment, D.B.S. received several blood transfusions. D.B.S. recovered from the surgery, completed his training, and in December 1983, returned to his home in Minnesota. In November 1984, D.B.S. married plaintiff N.A.S.; they had two children, one born in 1984 and another born in 1986. In June 1987, their third child, plaintiff C.R.S., was born. From birth, C.R.S. experienced health problems, and she failed to develop normally. Eventually, D.B.S. and N.A.S. took C.R.S. to an infectious disease specialist. In early 1989, a blood test revealed that C.R.S. was carrying HIV; subsequent tests revealed that D.B.S. and N.A.S. were also infected.

Because neither D.B.S. nor N.A.S. had engaged in behavior that would put them at high risk for HIV, plaintiffs believe that D.B.S. received infected blood in his 1983 transfusion, that he passed the virus to N.A.S. through sexual contact, and that N.A.S. then passed the virus to C.R.S., either in utero or through breast feeding. In April 1990, plaintiffs initiated this action against the United States. In the summer of 1992, Donor 3903, one of the nine donors who provided blood for D.B.S.' transfusion, tested positive for HIV. C.R.S. and D.B.S. have both developed Acquired Immune Deficiency Syndrome (AIDS). C.R.S., now age five, is bedridden, requires 24–hour nursing care, receives all nourishment and medication intravenously, and requires constant narcotic medication to control her pain. D.B.S. suffers from crytococcyl meningitis, a brain infection. N.A.S. has not developed AIDS, but suffers from AIDS-related complex.

Bruce A. Peterson, Steven E. Reichert, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, MN, Patrick M. Conlin, Gislason, Martin & Varpness, P.A., Edina, MN, for plaintiffs.

Janet M. Reno, Atty. Gen., Stuart M. Gerson, Asst. Atty. Gen., Civil Div., Roger D. Einerson, Asst. Director, Torts Branch, Civil Div., Brendan F. Flanagan, Special Atty., Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, DC, Francis X. Hermann, U.S. Atty., and Robert M. Small, Asst. U.S. Atty., Minneapolis, MN, for defendant.

At the time of D.B.S.' transfusion, public health agencies and the blood banking industry were struggling with the implications of the AIDS crisis. Beginning in July 1982, the Centers for Disease Control (CDC) began reporting evidence suggesting that AIDS was transmissible by blood. By late 1982, some CDC scientists had become convinced that AIDS was transmitted by a blood-borne infectious agent and that urgent measures were needed to reduce the risk of transfusion-transmitted AIDS. Affidavit of Dr. Donald Francis ¶ 5. In November and December of 1982, CDC scientists presented their conclusions that AIDS was transmitted by blood to the American Association of Blood Banks (AABB) and the Food and Drug Administration (FDA). *Id.* ¶ 5; Affidavit of Thomas C. Drees ¶ 8.[1]

On January 4, 1983, the CDC convened a national meeting to discuss what blood banks could do to protect the nation's blood supply. Francis Aff. ¶ 6; Drees Aff. ¶ 8. At the meeting, the CDC presented evidence indicating that AIDS was transmissible by blood and that it was most prevalent among homosexual and bisexual men and intravenous drug users. CDC officials therefore urged blood bankers to adopt measures to eliminate donors from those high risk groups. Francis Aff. ¶ 9. Because there was at the time no direct laboratory test for AIDS, CDC officials also recommended that blood banks use a surrogate test.[2] Francis Aff. ¶ 8. These recommendations were not met with consensus. Some blood bankers disputed the evidence that AIDS was transmissible by blood. Francis Aff. ¶ 10.

Disputes regarding the transmissibility of the AIDS virus continued throughout 1983; articles published in CDC publications in 1983 stated that while it had not been definitively established that AIDS was transmitted by blood, there was evidence to support such a hypothesis. Francis Dep. at 194–95. By early 1983, many experts had concluded that it was prudent to accept the hypothesis that AIDS was transmitted by blood and to adopt precautionary measures to protect the blood supply. Francis Aff. ¶ 6–10; Drees Aff. ¶ 6–9; Oberman Dep. at 83–4; *see also* Affidavit of Marcus Conant ¶ 3–4; Deposition of Brooks Jackson at 41–2. The industry was divided, however, regarding the nature of the measures necessary. Some blood bankers objected to the cost of surrogate testing or expressed fear of alienating the homosexual community. There was also disagreement regarding whether direct questioning of donors was necessary in order to screen out high risk individuals.

In the end, industry groups and the FDA adopted a conservative approach. Drees Aff. ¶ 7. In March 1983, the FDA and the AABB recommended revised donor screening procedures to reduce the risk that AIDS would be transmitted through donated blood. Specifically, the FDA and the AABB recommended educating donors and blood bank personnel about AIDS, questioning donors about early signs of AIDS, and asking persons in groups at high risk of carrying AIDS to refrain from giving blood. Affidavit of Steven E. Reichert Exs. 13, 14. The recommendations did not suggest using direct questioning or surrogate testing.

In the military, policies regarding blood banks were established by the Military Blood Program Office (MBPO). The MBPO was created by the Department of Defense in 1972 in order to maintain and disseminate plans for collecting, processing, and distributing blood for the military. Def.'s Ex. 12. In 1974, the Department of Defense and the FDA entered into a memorandum of understanding under which the military blood banks voluntarily subjected themselves to FDA licensing requirements. Def.'s Ex. 13. Although the MBPO was empowered to establish its own blood banking policies, the

---

1. The FDA is responsible for regulating blood bankers and blood banks. Deposition of Donald P. Francis at 108. The AABB is a private organization of blood banks and transfusion services; most hospitals and community blood banks are members of the AABB, which performs inspection and accreditation services for its members. Deposition of Harold Oberman at 12, 44, 49.

2. A surrogate test identifies blood indicators that frequently occur in conjunction with AIDS. CDC data indicated that testing blood for the antibody to the hepatitis B core antigen (anti-HBc) would identify approximately eighty percent of the individuals at high risk for transmitting AIDS. Francis Aff. ¶ 8.

office typically limited its role to implementing FDA and AABB guidelines. Deposition of James Bates at 38–40, 78, 82. That is precisely what the MBPO did in response to the AIDS crisis. In an April 12, 1983 memorandum, the MBPO adopted the FDA/AABB guidelines for blood donor centers, recommending that members of identified high risk groups voluntarily refrain from donating blood and that both donors and blood bank personnel be educated about AIDS and its symptoms.

By the time Donor 3903 gave blood in August 1983, the MACH blood bank had responded to the MBPO memorandum by adding two steps to the donation procedure. First, the blood bank provided potential donors with an informational statement about AIDS. The statement identified high-risk groups, including those with AIDS symptoms, sexually active homosexual or bisexual men with multiple partners, and present or past abusers of intravenous drugs, and asked that members of those groups voluntarily refrain from giving blood. Reichert Aff. Ex. 19, 21; Deposition of John Mangum at 53. Second, the blood bank modified its donor cards to ask if potential donors had experienced symptoms associated with AIDS, such as skin cancer, Kaposi's sarcoma, night sweats, or unexplained fever. The donor card also required donors to verify that they had read the informational statement about AIDS and understood that members of high risk groups should not donate blood. Reichert Aff. Ex. 21. Blood bank personnel were instructed to make sure that donors answered the AIDS-related questions on the donor card, but were not given specific training regarding physical signs of AIDS. Mangum Dep. at 48, 75; Johnson Dep. at 77.

The measures adopted by the MBPO were based upon the measures recommended by the AABB and the FDA for civilian blood banks. The MBPO did not consider whether the civilian procedures would work in a military setting, and did not conduct any studies to determine whether the procedures were working. Bates Dep. at 135–44, 149–51. There is some evidence that the MBPO's

donor screening and voluntary self-deferral programs were not effective. When a laboratory test became available for HIV in 1985, comparative statistics on the number of confirmed HIV positive donors at military and civilian blood banks indicated that the risk of receiving HIV-infected blood from a military blood bank before 1985 was twice as high as the risk of obtaining infected blood from a civilian blood bank. Francis Aff. ¶ 25, 26; Affidavit of John Potterat ¶ 9.

The FDA/AABB guidelines did not provide for locating, testing, or warning blood recipients that they could have received infected blood. However, in late 1985, the Department of Defense decided to test all military personnel for exposure to HIV. Reichert Aff. Ex. 29. In February 1986, the Army Surgeon General published guidelines that classified persons who received blood transfusions between January 1980 and July 1985 as being at high risk for HIV. Reichert Aff. Ex. 30. The guidelines stated that those at high risk should be tested and followed; however, the guidelines were not mandatory. Deposition of Ernest T. Takafuji at 91. Testing was not made mandatory because the army lacked the resources to do so. *Id.* at 116.

In their complaint, plaintiffs alleged that defendant was liable on numerous theories, including strict liability, breach of warranty, and negligence; however, plaintiffs have withdrawn all claims except their claims that the military was negligent in failing to adequately screen blood donors and in failing to warn D.B.S. that he was at high risk for developing AIDS. Defendant now moves for summary judgment on those claims.[3]

### *DISCUSSION*

 A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."

---

**3.** In April 1991, defendants' motion to dismiss the action under the *Feres* doctrine was denied

by another judge of this court. *C.R.S. v. United States,* 761 F.Supp. 665 (D.Minn.1991).

454

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of a court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences to be drawn from the facts." *AgriStor Leasing*, 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585. (8th Cir.1987), *cert. denied*, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

■ Plaintiffs assert that because of the unique circumstances of the military, the FDA/AABB guidelines were clearly inadequate to address the threat of AIDS. A system based upon voluntary self-deferral was in plaintiffs' view doomed to fail because the military punished high risk behavior such as homosexuality and drug abuse with discharge; thus, plaintiffs assert that the military was negligent in mechanically implementing civilian screening procedures, rather than devising procedures that were geared toward the special circumstances of the military. Plaintiffs also argue that when the army became aware of the dangerousness of its blood supply, it negligently failed to warn D.B.S. that he may have received infected blood. Defendant argues that the military's decision to follow FDA/AABB guidelines and its decision not to notify blood recipients of the AIDS threat were discretionary decisions that are shielded from review under the discretionary function exception to the FTCA.

■ The FTCA waives the sovereign immunity of the United States, making it liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. However, the waiver of immunity is limited by the discretionary function exception, which bars claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The purpose of the discretionary function exception is to prevent judicial second-guessing of legislative and administrative policy decisions. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814–16, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984).

■ The discretionary function exception applies only to challenged governmental action that is the product of judgment or choice and is based upon considerations of social, economic, and political policy. *Layton v. United States*, 984 F.2d 1496, 1499 (8th Cir.1993) (citing *Berkovitz v. United States*, 486 U.S. 531, 534–38, 108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531 (1988)). In determining whether the discretionary function exception applies, a court must consider the nature of the conduct, not the status of the actor. *Varig Airlines*, 467 U.S. at 812–14, 104 S.Ct. at 2764. If the conduct violates a binding policy, regulation, or statute, the discretionary function exception does not apply, because a government employee has no discretion to violate such an edict. *Layton*, 984 F.2d at 1499–1500. However, "if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *United States v. Gaubert*, —— U.S. ——, ——, 111 S.Ct. 1267, 1274, 113 L.Ed.2d 335 (1991).

As an initial matter, it should be noted that plaintiffs do not challenge the FDA guide-

lines themselves. Rather, they challenge the military's decision to adhere to FDA/AABB guidelines, rather than devising its own screening and recipient notification policies. In arguing that the MBPO's decision to follow the FDA/AABB guidelines is protected by the discretionary function exception, defendant points out that the MBPO was staffed by only three people: an officer, a sergeant, and a secretary. Bates Dep. at 23. The director of the MBPO testified that the MBPO was not equipped to independently evaluate data regarding blood banking procedures, but that it instead relied on the consensus of the blood banking community. Bates Dep. at 76. Defendant asserts that it was because of its limited resources that the MBPO decided to implement FDA/AABB guidelines rather than to devise its own guidelines. Defendant contends that the military's decision not to implement mandatory blood recipient notification was also based on lack of resources. Because the military's decision to follow FDA/AABB guidelines regarding both blood screening and recipient notification falls within the discretionary function exception to the FTCA, defendant argues, it cannot give rise to liability.

■ Plaintiffs make various arguments in response. First, plaintiffs point out that the record contains no evidence that the military made deliberate policy decisions to rely upon the FDA/AABB guidelines or to not notify blood recipients that they might have received infected blood. Plaintiffs assert that there is no testimony that the MBPO weighed the policy implications of adopting surrogate testing or direct donor questioning or that the MBPO decided not to implement such measures due to cost constraints; nor is there testimony indicating that the army weighed competing policy considerations and made a conscious decision not to warn blood recipients. Because defendant has not established that the military actually weighed public policy considerations in determining whether to adopt the FDA guidelines or notify blood recipients, plaintiffs assert that defendant cannot rely upon the discretionary function exception.

In support for this proposition, plaintiffs rely upon *Andrulonis v. United States*, 924

F.2d 1210 (2d Cir.), *cert. granted and judgment vacated*, —— U.S. ——, 112 S.Ct. 39, 116 L.Ed.2d 18, *previous decision reinstated*, 952 F.2d 652 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2992, 120 L.Ed.2d 869 (1992). In *Andrulonis*, the plaintiff was a bacteriologist who contracted rabies while conducting a laboratory experiment with a rabies viral strain. The viral strain had been provided by a CDC scientist who observed the experiment during which the plaintiff contracted rabies. The plaintiff alleged that the United States was liable under the FTCA for the CDC scientist's negligent failure to interrupt the experiment when he observed obviously dangerous laboratory conditions. The government argued that the CDC scientist's failure to warn of the dangers presented by the experiment was shielded by the discretionary function exception.

The Ninth Circuit disagreed. The court acknowledged that the government's decisions to encourage rabies research, provide funding for the research, and provide the plaintiff's employer with the viral strain were decisions that implicated policy considerations and were therefore protected by the discretionary function exception. But the failure to warn did not in the court's view fall within the discretionary function exception, because "[t]he situation simply did not lend itself to policy balancing, [nor] is there any indication that [the CDC scientist] considered the policy implications or the pros and cons of allowing the experiment to proceed." *Andrulonis*, 924 F.2d at 1219.

Plaintiffs rely upon this statement to argue that before it can rely upon the discretionary function exception, the government must establish that the military actually considered the policy implications of its decisions. The Court concludes that plaintiffs have read *Andrulonis* too broadly. The decision in *Andrulonis* did not rest solely on the scientist's failure to actually consider the policy implications of allowing the experiment to proceed; rather, the *Andrulonis* court focused on the type of decision that the scientist made and whether that decision was the type of governmental policy decision that the discretionary function exception was intended to protect. *See Andrulonis*, 952 F.2d at 654.

Such an inquiry is mandated by the Supreme Court's decision in *United States v. Gaubert*, —— U.S. ——, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). In *Gaubert*, the Court held that where established governmental policy allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. Thus, in determining whether to apply the discretionary function exception, "the focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, —— U.S. at ——, 111 S.Ct. at 1275. Decisions regarding how to protect the blood supply and blood recipients from the AIDS threat are decisions that are susceptible to policy analysis; they require the decision-maker to balance the degree of risk against the social, economic, and political costs of prevention. *Layton*, 984 F.2d at 1504. Thus, if the governmental decision-makers were vested with the discretion to address those concerns, their decisions must, under *Gaubert*, be presumed to be grounded in policy.

Perhaps in recognition of this fact, plaintiffs next argue that the MBPO had no discretion to implement the FDA/AABB guidelines without analysis. In making this argument, plaintiffs rely upon the Department of Defense directive that established the MBPO. The directive instructed the MBPO to "develop, recommend and monitor policies (fully coordinated with the Military Departments) on ... [t]he collection, procurement, processing, storage, distribution, and management of whole blood." Reichert Aff.Ex. 40 § V.B.8. In addition, the directive stated that the MBPO was to "designate, and if necessary, prepare approved written guides relating to all phases of blood banking procedures to be used as minimum standards by the military services." *Id.* § V.E.10. Plaintiffs assert that the directive specifically required the MBPO to develop and recommend blood collection procedures and prepare minimum written standards, and that the MBPO had no discretion to violate the directive. Plaintiffs argue that because the MBPO's decision to follow FDA/AABB guidelines was

contrary to the expressed policies of the Department of Defense directive, it cannot be a policy decision that is shielded by the discretionary function exception.

In the Court's view, the language of the Department of Defense directive undermines plaintiffs' argument, rather than supporting it. The Department of Defense directive did not require the MBPO to develop its own standards or subject FDA/AABB guidelines to independent analysis. Rather, the directive instructed the MBPO, in general terms, to develop and monitor blood collection policies, as well as to "designate, *and if necessary*, prepare" written minimum standards to govern blood banking procedures. This language indicates that the MBPO had discretion in determining what standards and procedures to adopt.

Moreover, as defendant points out, the Department of Defense itself entered into a memorandum of understanding with the Food and Drug Administration, under which the Department of Defense voluntarily subjected itself to FDA licensing requirements. Given that fact, it is difficult to characterize the MBPO's decision to adopt the FDA/AABB guidelines regarding AIDS as an act that contravened established governmental policy. Because the Department of Defense directive conferred upon the MBPO the discretion to develop policies for military blood banks, the MBPO's decisions must be presumed to be grounded in policy under *Gaubert*.

Even if the *Gaubert* presumption did not apply in this case, plaintiffs' claims would be barred by the discretionary function exception. Plaintiffs' argument that the record contains no evidence establishing that the government actually weighed the policy implications of its decisions is, in effect, an argument that the discretionary function exception does not apply where the government fails to make a considered decision. But the discretionary function exception, by its terms, applies both to the exercise of a discretionary function and to the failure to exercise a discretionary function. 28 U.S.C. § 2680(a). Thus, where an agency is not required by statute or regulation to warn or

protect an individual from a given hazard, the agency's failure to consider or adopt a warning policy is shielded from review. *Bacon v. United States,* 810 F.2d 827, 829–30 (8th Cir.1987); *see also Layton,* 984 F.2d at 1504–05. Because plaintiffs have pointed to no established policy that required the military either to adopt more stringent blood screening procedures or to warn blood recipients, their claim that the military failed to do so is barred by the discretionary function exception.

■ Plaintiffs' third argument is that the military's decisions about screening procedures and recipient notification are in any event outside the scope of the discretionary function exception because the exception does not apply to technical and safety decisions. Plaintiffs base this argument on *Alabama Elec. Co-op v. United States,* 769 F.2d 1523 (11th Cir.1985). However, that case does not hold that technical and safety decisions are in every instance outside the scope of the discretionary function exception. Rather, in *Alabama Elec. Co-op,* the court held that where the Army Corps of Engineers makes a social, economic or political policy decision concerning project design, the decision is insulated from review under the discretionary function exception, but that in the absence of such a policy decision, the Corps' design decisions are subject to judicial review under state tort law standards. *Alabama Elec. Co-op,* 769 F.2d at 1536–37.

The law in the Eighth Circuit is the same. *Aslakson v. United States,* 790 F.2d 688 (8th Cir.1986). In *Aslakson,* the court held that "where the challenged governmental activity involves safety considerations under an established policy rather than the balancing of competing public policy considerations, the rationale for the [discretionary function] exception falls away and the United States will be held responsible for the negligence of its employees." *Aslakson,* 790 F.2d at 693. Thus, contrary to plaintiffs' assertion, there is no blanket rule stating that technical and safety decisions are beyond the scope of the discretionary function exception. Rather, as has been previously discussed, the focus is on whether the particular decisions that are challenged are the type of policy-making decisions that Congress intended to shield from judicial scrutiny. The Court concludes that in the instant case, they are. In arguing that the MBPO erred in adopting standards devised for civilian blood banks, plaintiffs do not allege that government agents were negligent in failing to follow established safety standards, but that the MBPO was negligent in determining what standards military blood banks were to follow. Similarly, plaintiffs' failure to warn claim is based not on the contention that the army failed to comply with an established notification policy, but on the contention that the army failed to adopt such a policy. Because plaintiffs challenge the military's choices regarding safety procedures rather than its implementation of those choices, their claims are barred under *Aslakson.*

■ Finally, plaintiffs assert that the military's decisions regarding blood screening procedures and recipient notification are not protected by the discretionary function exception because once the government decides to act, it is responsible for acts negligently carried out, even though discretionary decisions are constantly made as to how the acts are accomplished. In other words, plaintiffs assert that although the military's initial decision to establish blood banks may be shielded by the discretionary function exception, decisions made in providing blood banking services are not. In support for this argument, plaintiffs rely upon *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

In *Indian Towing,* the plaintiff alleged that the Coast Guard had negligently failed to maintain a lighthouse because it had allowed the light to go out. The government argued that the plaintiff's claim was barred because the FTCA did not impose liability for the negligent performance of uniquely governmental functions. The Court rejected this argument, holding that once the Coast Guard exercised its discretion to operate the lighthouse and engendered reliance on the light, it was required to use due care in assuring that the light was kept in working order. *Indian Towing,* 350 U.S. at 69, 76 S.Ct. at 126–27. Based in part upon *Indian Towing,* some courts applied a planning/oper-

**458**

ational distinction in analyzing the discretionary function exception. *See Gaubert,* —— U.S. at ——, 111 S.Ct. at 1275. Under this analysis, decisions made at the planning level are insulated from judicial review, while decisions relating to normal, day-to-day operations of the government are not. *Bacon,* 810 F.2d at 829; *Alabama Elec. Co-op,* 769 F.2d at 1528 (citing *Swanson v. United States,* 229 F.Supp. 217 (N.D.Cal.1964)).

Plaintiffs' argument that the discretionary function exception protects only the initial decision to establish blood banks harks back to the planning/operational analysis. That analysis, however, was soundly rejected by the United States Supreme Court in *Gaubert. Gaubert,* —— U.S. at ——, 111 S.Ct. at 1275. In *Gaubert,* the Court made clear that the discretionary function exception is not confined to discretionary decisions made at the policy or planning level. The issue is not whether the challenged decision occurred at an operational level versus a management level, but whether the decision is grounded in policy concerns. *Id.* In determining what standards to apply in collecting blood and whether to require recipient notification, the military made discretionary, policy-based decisions. Because plaintiffs challenge those decisions themselves, rather than negligent acts or omissions in their implementation, their claims are barred by the discretionary function exception. Therefore, defendant's motion for summary judgment will be granted.

▮ The Court has been informed that plaintiffs intend to appeal this order and that defendant intends to appeal the prior order denying its motion to dismiss based upon the *Feres* doctrine. The Court strongly believes that appellate review of these issues prior to any trial of this matter is in the interest of justice. In view of plaintiffs' medical conditions, the Court further believes that it would be appropriate for plaintiffs to request expedited consideration of this matter by the Court of Appeals.

Accordingly, based on the foregoing and upon all the files, records, and proceedings herein,

**IT IS ORDERED** that defendant's motion for summary judgment is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**