Blair v. Frank Whitcomb Construction Corp., No. 498-01 CnC  (Norton, J., June 28, 2005)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT
Chittenden County, ss.:

HOPE BLAIR, Individually and as Administratrix
of the Estate of Brian K. Blair, and NIKI BLAIR, In her
capacity as guardian of Bryana Blair

v.

FRANK W. WHITCOMB CONSTRUCTION
CORPORATION and STATE OF VERMONT

ENTRY

This case stems from a traffic accident in which the passenger, Brian K. Blair, was killed.  The plaintiffs have filed survival, wrongful death, and loss of consortium claims against the State of Vermont and Frank W. Whitcomb Construction Corporation, which was undergoing road work under contract with the State where the accident took place. The State has moved for summary judgment, arguing that it is protected by sovereign immunity, that the plaintiffs cannot prove proximate cause, and that the driver's negligence was an efficient intervening cause. Whitcomb has joined the motion with respect to the second and third arguments.

Summary judgment is appropriate where there is no genuine issue as to any material fact and a party is entitled to judgment as a matter of law. V.R.C.P. 56(c)(3). The following facts are in a light most favorable to the plaintiffs as the nonmoving parties. Carr v. Peerless Ins. Co., 168 Vt. 465, 476 (1998).

On May 26, 1999, Brian Blair was riding as a passenger in a truck, which Charles Allyn was driving. While traveling north on Route 2 in South Hero, Vermont, Allyn veered off to the shoulder while reaching for a soda and momentarily taking his eyes off the road. Recent road work had created a vertical drop-off from the new pavement to the older shoulder material. When the truck's tires fell into this drop-off, the vehicle tipped onto its side into a roadside ditch. Blair was killed as a result.

Whitcomb had created the drop-off in recent road work done under contract with the State. As part of the contract, the State monitored Whitcomb's progress and the safety of the construction throughout the work. The State's employees, including the on-site resident engineer, William R. Flanders, Jr., relied on safety standards incorporated into the construction contract, including "E-108," which addressed the placement of traffic control devices along roadside drop-offs under certain circumstances. Such control devices include "channelizing" devices and barriers. Channelizing devices include cones, plastic drums, barricades, and vertical panels. Standard E-108 includes a number of drop-off scenarios, including widths between the traveled way on a road and the barrier, heights of the drop-offs, slope ratios of the drop-offs,[1] and devices required.

At the location of the accident, the drop off was between four to six inches and the slope ratio was approximately one-to-one. Under such circumstances, Standard E-108 calls for channelizing devices or barriers, depending on the width of the shoulder space between the traveled way and the edge of the drop-off. The standard states that "channelizing devices or barrier should be placed to maximize the width of the traveled-way." It also states that "these conditions and treatments are only part of the traffic control system and shall be used in addition to the proper work zone signing." The standard also states that "on borderline conditions the engineer shall determine which treatment is adequate for the existing conditions." There is no evidence, however, that there were borderline conditions in the instant case.

Flanders did not order the use of channelizing devices on the drop-off where the accident occurred. Several witnesses, including Flanders, testified by deposition that

---

[1] The slope ratio is derived by measuring the length of a horizontal plane coming off the slope and the length of a vertical plane coming off the slope, where the two planes meet at a 90 degree angle. The higher the initial number in the ratio, the less steep the slope.

channelizing devices should have been used under hypothetical circumstances similar to those of this case.

The court has no jurisdiction to hear a lawsuit against the State unless the State waives its sovereign immunity. Lane v. State, 174 Vt. 219, 222 (2002). Under the Vermont Tort Claims Act, the State has waived sovereign immunity for negligent and wrongful conduct of State employees who act within the course of their employment. 12 V.S.A. § 5601(a). The Act has an exception, however, for "an act or omission . . . based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused." Id. § 5601(e)(1). "The purpose of this exception is assure that the courts do not invade the province of coordinate branches of government by passing judgment on legislative or administrative policy decisions through tort law." Sabia v. State, 164 Vt. 293, 307 (1995).

In interpreting this exception, the Vermont Supreme Court has adopted the two-part test in United States v. Gaubert, 499 U.S. 315 (1991). Searles v. Agency of Transp., 171 Vt. 562, 563 (2000) (mem.). A court must first determine whether the State employee's act was discretionary in nature, involving "an element of judgment or choice." Lane, 174 Vt. at 223 (internal quotes omitted). In determining whether an act was discretionary in nature, the court looks to the statutory or regulatory authority under which the actor was operating. See, e.g., id. at 224–25 (examining statutory and regulatory authority to determine that closing highways was a discretionary act). The court also uses common sense to determine whether an act is one that must, by its nature, "involve discretion and elements of choice." Id. at 228 (holding that "decisions concerning winter maintenance procedures fall under the discretionary function exception"). Where a government actor's authority and guidelines are not set out in particular statutes or regulations, courts look to any other written guidelines, project statements, manuals, and checklists, as well as oral understandings among government actors. See Donald N. Zillman, Protecting Discretion: Judicial Interpretation of the Discretionary Function Exception to the Federal Tort Claims Act, 47 Me. L. Rev. 365, 381 (1995).

If the act was discretionary, then the court must next determine whether the judgment is of the kind that the discretionary function exception was designed to shield. In other words, the court must determine if the judgment is "based on considerations of

3

public policy." <u>Lane</u>, 174 Vt. at 224 (internal quotes omitted). In order to be based on public policy, the discretion authorized must be "'grounded in social, economic, and political policy.'" <u>Berkovitz v. United States</u>, 486 U.S. 531, 537 (1988) (quoting <u>United States v. Varig Airlines</u>, 467 U.S. 797, 814 (1984)). Where the State has established a governmental policy, as expressed or implied by statute, regulation, or agency guidelines, that allows a government agent to exercise discretion, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." <u>Lane</u>, 174 Vt. at 225. The plaintiff then has the burden to show that the conduct in question is "'not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.'" <u>Searles</u>, 171 Vt. at 563 (quoting <u>Gaubert</u>, 499 U.S. at 324-25).

Here, in order to determine whether Flanders's omission in failing to erect a channelizing device was a discretionary act, the court must examine the authority under which Flanders was operating while performing his job. The State argues that the policies governing Flander's actions included not only the specific prescriptions of Standard E-108, but also the common understanding of this standard and the Federal Highway Administration's Manual on Uniform Traffic Control Devices (MUTCD), on which the E-108 standard was allegedly based. The plaintiffs argue that the policies with regard to the channelization devices were limited to Standard E-108.

Standard E-108, by its terms, confers no discretion in using channelization devices or barriers where there is a pavement drop-off, unless there is a "borderline condition." The standard provides explicit specifications, including the height of the drop-off, the distance between the edge of the drop-off and the traveled-way, and the slope of the drop-off, and prescribes precise devices required under virtually all circumstances. Standard E-108 does not, as the State suggests, provide that it be read in conjunction with MUTCD standards. Rather, the standard states that it "shall be used in addition to the proper work zone signing," suggesting that Standard E-108 provides another layer of guidance for highway construction contractors and resident engineers.

The State points to no other language in Standard E-108 or in the surrounding contract which suggests that the standard is anything but mandatory. Other portions of the contract confirm that the construction work must comply with Standard E-108. For instance, the cover sheet to the improvement plans states: "Construction is to be carried on in accordance with these plans and the standard specifications for construction dated 1995." The standards, in turn, provide that the State inspector "will not be authorized to

4

alter or waive the provisions of the contract, nor will the Inspector be authorized to issue instructions contrary to the plans and specifications." With regard to traffic control devices, the standards state that "[a]ll traffic control devices shall conform to the contract requirements and the MUTCD."

The State highlights deposition testimony from witnesses who stated that despite its unequivocal language, Standard E-108 calls for engineering judgment, and is therefore discretionary. Bruce Nyquist, project manager for the Traffic Design Unit of the Vermont Agency of Transportation, helped draft Standard E-108. He testified that resident engineers must consider a host of other factors outside of Standard E-108's specifications. Such factors include the speed of traffic in the section and the manner in which road workers were working.

Flanders provided several reasons as to why he did not use channelization devices at the scene of the accident, despite the drop-off. He stated that the shoulder width was narrow, which meant that channelization devices would have dangerously confined the useful pavement space. He also stated that the road was straight, level, and fully paved, and the visibility was good. He stated that "low shoulder" and "do not pass" signs were already in place nearby. Finally, he stated that he considered his own "reasonable engineering judgment." The State argues that the additional factors upon which Flanders relied render his decision to forgo channelization devices discretionary.

Other witnesses also suggested that resident engineers must consider factors outside of Standard E-108. Walter Kilareski, a professional engineer, stated that such factors include the length of the project, the construction sequence, and the method by which the construction crew is overlaying. Jonathan Day, another resident engineer with the Vermont Agency of Transportation, stated that Standard E-108 mandates channelization devices except where the narrowing of the road might create a safety hazard.

The express wording of Standard E-108 contradicts suggestions by these witnesses that the standard is discretionary. Furthermore, John A. Serth, a consulting engineer who submitted an affidavit on behalf of the plaintiffs, stated that Standard E-108 was mandatory in this case. Accordingly, the court holds that the State has failed to demonstrate that Flanders had discretion over whether to use channelization devices.

Flanders's omission in this case does not fall with the discretionary function exception to the tort claims act.

This holding is in conformity with several federal cases interpreting identical wording in the federal Tort Claims Act. See, e.g., Phillips v. United States, 956 F.2d 1071, 1076–77 (11th Cir. 1992) ("Where there exists a mandatory responsibility, there is no room for a policy choice. In the instant case, Army Corps personnel did not obey the Corps's Safety Manual's directives. The Army Corps's conduct did not involve a permissible exercise of policy judgment."); Aslakson v. United States, 790 F.2d 688, 692 (8th Cir. 1986) ("[T]he discretionary function exception does not apply to a claim that government employees failed to comply with regulations or policies designed to guide their actions in a particular situation."); cf. Routh v. United States, 941 F.2d 853, 855 (9th Cir. 1991) (holding discretionary function applied where typical contract provisions requiring mandatory oversight by contracting officer were not present in specific contract); Kelly v. United States, 924 F.2d 355, 360–62 (1st Cir. 1991) (holding discretionary function applied where government presented uncontested evidence that regulations, though mandatory in tone, were applied in discretionary manner but stating that "[a] regulation which straightforwardly strips all discretion might well be beyond the reach of [the discretionary function exception] even if ignored in practice"). Federal caselaw is persuasive in applying identical provisions of the Vermont Tort Claims Act. Lane v. State, 174 Vt. 219, 223 n.2 (2002).

Even if the court were to credit Flanders, Nyquist, and other State witnesses and hold that the standards under which Flanders was operating at the site of the accident were discretionary, the State still has the burden to show that the discretion exercised was "based on considerations of public policy." Id. at 224. The burden does not shift to the plaintiffs, because whatever discretion may have existed is not expressed or implied in Standard E-108. Rather, such discretion was merely expressed by State witnesses.

The alleged discretion regarding the use of channelization devices is based on engineering judgment that the devices could have been less safe (e.g., if the roadway may have been too narrow with channelization devices) and that they could have been unnecessary (e.g., if the road was straight, level, and fully paved, with good visibility and with slow moving traffic, and furthermore, other warning signs were in place). These reasons do not implicate social, economic, or political choices. Whether certain steps would have made the road safer is a technical issue, not a policy-based decision. See,

6

e.g., Ayala v. United States, 980 F.2d 1342, 1349–50 (10th Cir. 1992) (holding that decisions "governed solely by technical considerations" are not policy-based). And whether additional safety steps were necessary is an issue of cost-benefit analysis. Cost-benefit decisionmaking that is unsupported by information regarding actual costs, as here, is not policy-based. See, e.g., Routh, 941 F.2d at 856.

Accordingly, even if Flanders had the discretion to make decisions outside the parameters set by Standard E-108, the State has not demonstrated that such discretion was the type covered by the discretionary function exception. The State does not have sovereign immunity regarding the plaintiffs' claims.

Finally, the court notes that in passing judgment on the discretionary function exception, the court makes no determination as to whether Flanders or Whitcomb were negligent in failing to require channelization devices. "Negligence is irrelevant to the discretionary function inquiry." Routh, 941 F.2d at 855. The court's sole inquiry at this stage is to determine what discretion Flanders had and whether such discretion, if any, related to public policy. The question as to whether Flanders's or Whitcomb's acts or omissions with regard to the construction site deviated from the appropriate standard of care is ultimately one of fact for the jury.

The State also argues that 12 V.S.A. § 5601(e)(8), another exception to the tort claims act, protects it from liability. Subsection 5601(e)(8) excepts claims "arising from the selection of or purposeful deviation from a particular set of standards for the planning and design of highways." Decisions regarding the use of safety devices during highway construction are not encompassed within "the planning and design of highways." Conditions created by construction sites are temporary and require different considerations than the permanent choices for placement, structure, and design of highways.

Moreover, the Vermont Supreme Court has held that unintentional deviation from design standards is not covered by § 5601(e)(8) because it is not "purposeful." Mc-Murphy v. State, 171 Vt. 9, 12 (2000). Here, even if the court were to accept that safety decisions in road construction are design decisions, there are material issues of fact in this case as to whether Flanders's decision to deviate from Standard E-108 was negligent. The plaintiffs have provided expert testimony claiming that Standard E-108 required the use of channelization devices at the site of the accident, which is enough to raise a factual

7

question as to whether the failure to abide by Standard E-108 constituted negligence. Therefore, the State lacks sovereign immunity under § 5601(e)(8).

Turning to the State's arguments regarding causation, the State first argues that the plaintiffs cannot prove proximate cause because the driver, Charles Allyn, caused the accident by reaching for a soda and drifting off the road. The plaintiffs, however, argue that Allyn's act was merely a concurrent cause, and a reasonable trier of fact could still infer causation based on the lack of channelization devices.

"Proximate cause is ordinarily an issue to be resolved by the jury unless the proof is so clear that reasonable minds cannot draw different conclusions or where all reasonable minds would construe the facts and circumstances one way." Fritzeen v. Trudell Consulting Eng'rs, Inc., 170 Vt. 632, 635 (2000) (mem.) (internal quotes omitted). Here, the plaintiffs have proffered enough evidence so that reasonable minds could find that the lack of channelization devices contributed to the accident. Although Allyn would probably not have drifted off to the shoulder of the road if he had not taken his eyes of the road while reaching for his soda, reasonable factfinders could infer that he would have been more alert to the dangers of drifting to the side of the road had he seen chann-elization devices in the first place. In other words, with a clear warning of the danger on the side of the road, Allyn might have been more inclined to ignore his thirst for a soda in the interest of more attentive driving through the construction site. Ultimately, this determination must be left to the factfinder. See Restatement (Second) of Torts § 434 & cmt. c (1965).

The same can be said with regard to the State's second causation argument. The State argues that Allyn's negligence in drifting off to the shoulder was an intervening and superseding cause of the accident.

> "One shown to have been negligent is liable for all the injurious consequences that flow from his negligence until diverted by the intervention of some efficient cause that makes the injury its own, or until the force set in motion by the negligent act has so far spent itself as to be too small for the law's notice."

Roberts v. State, 147 Vt. 160, 163 (1986) (quoting Woodcock's Admr. v. Hallock, 98 Vt. 284, 290 (1925)); see also Restatement (Second) of Torts § 431(a) (defining legal cause

8

actor's conduct that forms "substantial factor in bringing about the harm"). The plaintiff bears the burden to prove causation, but

> [t]he plaintiff is not . . . required to prove his case beyond a reasonable doubt. He is not required to eliminate entirely all possibility that the defendant's conduct was not a cause. It is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not. . . . The fact of causation is incapable of mathematical proof, since no man can say with absolute certainty what would have occurred if the defendant had acted otherwise. If, as a matter of ordinary experience, a particular act or omission might be expected to produce a particular result, and if that result has in fact followed, the conclusion may be justified that the causal relation exists.

Restatement (Second) of Torts § 433B cmt. b; see also Restatement (Third) of Torts: Apportionment of Liability § 4 cmt. c (2000) (stating that factfinder must determine cause "unless the judge determines that the jury can reasonably come to only one conclusion and judgment as a matter of law is warranted").

Here, again, the plaintiffs have proffered enough evidence to support a reasonable conclusion that the lack of channelization devices was an additional cause of the accident. Reasonable factfinders could find that the failure to make drivers attentive to particular dangers on the road could lead to them being less attentive to those dangers.

Accordingly, the State and Whitcomb do not demonstrate that the plaintiff's causation evidence fails as a matter of law.

## ORDER

For the foregoing reasons, the defendants' summary judgment motion is DENIED.

Dated at Burlington, Vermont, June 28, 2005.

_____/s/_____
Judge

9